3:20-mj-2275

# AFFIDAVIT

I, Steffan Hollifield, a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a TFO with the FBI since June of 2019.  I am also a Detective with Sevier County Sheriff's office, where I have worked in law enforcement since joining the Sheriff's department in August of 2016.  I have received training in, and conducted numerous investigations into, controlled substance distribution, including cocaine, methamphetamine, and other illegal narcotics.  That experience in drug trafficking investigations includes working on wiretaps of drug trafficking organizations, traffic stops, search warrant executions, interviewing confidential sources and defendants.

3.      As a result of my law enforcement training and experience, conversations with others in law enforcement, and life experience, I am familiar with social media platforms such as Facebook and their uses for legal and illegal activities.

4.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including crystal methamphetamine and other controlled substances, I know the following:

      a.      the methods in which smugglers and drug traffickers conduct their business, including but not limited to their methods of importing and distributing drugs;

      b.      their use of conveyances in the conduct of their business;

c.      their use of cellular telephones (cell phones) and other cellular communication devices;

d.      their use of numerical codes and code words to conduct their transactions;

e.      methods of laundering drug proceeds;

f.      smugglers and drug traffickers oftentimes use cell phones to communicate about their drug trafficking activities (via telephone calls and / or text messaging) and that they oftentimes use the cell phones take photographs of their drugs, drug proceeds, and/or stash locations;

g.      smugglers and drug traffickers oftentimes conceal drugs and/or drug proceeds in vehicles to avoid law enforcement detection when transporting drugs and/or drug proceeds.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      I make this affidavit in support of an application for a search warrant for information associated with the telephone number (971) 732-3277, subscribed to by "Adan Toscano, 1111 Goff Road, Forest Grove, Oregon," which is hereinafter referred to as the "TOSCANO PHONE," that is stored at premises owned, maintained, controlled, or operated by the wireless provider of that number. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the wireless provider to disclose

2

to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, have been committed by Juan Lopez, the user of the TOSCANO PHONE, and others unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

**PROBABLE CAUSE**

Local county law enforcement officers were investigating several cocaine dealers in Sevier County, Tennessee beginning in the Spring of 2020.

9.      On April 30, 2020, a confidential source ("CS"), CS1[1], who was working with law enforcement in Sevier County, Tennessee purchased approximately 2 grams of cocaine from Alex Martinez ("MARTINEZ") in an audio/video controlled buy in the Eastern District of Tennessee. CS1 knew the cellphone number for MARTINEZ, 865-621-8408 ("MARTINEZ PHONE") which CS1 used to call MARTINEZ and to set up this cocaine deal. Law enforcement observed the CS1 speaking with MARTINEZ, who was using the MARTINEZ PHONE, and the call was recorded.

---

[1] CS1 initially agreed to work off a traffic ticket and fines. After, the source has agreed to continue to work for the prospect of remaining in the United States. His work with law enforcement began on or about 11/1/2019. He has almost no criminal history, which includes only a traffic citation. Law enforcement considers CS1 to be a reliable source of information. In this case, however, his work was carefully supervised and corroborated by actual recordings and observations by law enforcement officers. The source is considered to be credible and reliable by law enforcement.

On May 12, 2020, CS1 purchased approximately 2 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement in the Eastern District of Tennessee. CS1 told law enforcement that he called MARTINEZ on the MARTINEZ PHONE to setup this deal, and the call was neither recorded nor observed by law enforcement.

10. On June 8, 2020, CS1 purchased approximately 2 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement in the Eastern District of Tennessee. Prior to the controlled buy, CS1 called MARTINEZ on the MARTINEZ PHONE to setup this deal. One of the calls to set up the deal occurred while law enforcement observed, which was not recorded.

11. On or about July 9, 2020, CS2,[2] at the direction of local law enforcement, contacted Juan Lopez ("LOPEZ") to arrange a purchase of cocaine in the Eastern District of Tennessee. CS2 told law enforcement that LOPEZ was the biggest drug dealer that he knew of in the area, and agreed to work with law enforcement to arrange a controlled buy with LOPEZ. CS2 knew he could contact LOPEZ on telephone number 865-237-6764.  According to a subpoena, that number carries the International Mobile Subscriber Identity ("IMSI") 310240130838305, is subscribed to by "Juan Lopez, P.O Box 15955 Lenexa, KS, 66285, and is hereinafter the "LOPEZ PHONE or LOPEZ TELEPHONE."  CS2 then worked with law enforcement and contacted LOPEZ seeking to buy 8 grams of cocaine for $500. The deal was planned with law enforcement for July 9, 2020.

12. Toll records show that LOPEZ, using the LOPEZ PHONE, and CS2 communicated several times on July 9, 2020 prior to when CS2 met with law enforcement to get audio and video

---

[2] CS2 initially agreed to work with law enforcement after a DUI arrest. His work with law enforcement began on or about 5/26/2020. The CS2 worked for law enforcement with the hope of a reduced charge, and/or sentence. The CS2 has a history of traffic violations and his DUI conviction was reduced to reckless endangerment. CS2 told law enforcement that he had previously bought cocaine from LOPEZ.  Law enforcement considers CS2 to be a reliable source of information, but in this case all of his information was verified and/or fully corroborated through independent law enforcement observation and the recording of his conversation with LOPEZ. The source is considered to be credible and reliable by law enforcement.

recording equipment for the controlled by later that day. Before the deal happened, audio and video equipment captured LOPEZ and the CS2 speaking over the phone at approximately 3:55pm. CS2, as he had been told by law enforcement to do, placed the call on speaker phone so that the call could be recorded on audio/video equipment in CS2's vehicle. Following the deal, CS2 showed his phone to law enforcement who confirmed that the call was made to LOPEZ, who was using the LOPEZ TELEPHONE, which matches toll records that show the LOPEZ TELEPHONE communicating with CS2 at the same time. The following is a translation of the recorded call between CS2 and LOPEZ[3]:

CS2:        hello, hello, hello

CS2:        oh

LOPEZ:      hello

CS2:    Hey Juan, I'm in a white Escalade, old man, a Cadillac Escalade old man, white one

LOPEZ:      Ok old man, you're in ("inaudible"), ok they are passing the Food City, they'll be there now

CS2:    Alright bro I'm here just tell them to come in here in my Escalade come in my Escalade

…

LOPEZ:      Um Um are you going to do the party or what asshole

CS2:        Alright bro, well I don't know if I should do it at my house bro, but I also don't want to, you know, it forms a mess…

LOPEZ:      Not everyone is going, not everyone is going

CS2:    Yes, no it's better I rent a fuckin cabin, and there are several ones with 17 rooms about 10 rooms, some with 5 floors. I also don't want all the fuckin, I also don't want all the county bro, only the cool people, you understand, only us bro

LOPEZ:      (inaudible)

CS2:        Alright old man thanks Juan

---

[3] This recorded conversation was in Spanish and was translated into English by a fluent speaker of both languages.

13.    Based on my training and experience, as well as the context of the call within this investigation, I believe that during this call CS2 told LOPEZ she/he was ready to make the cocaine deal and was waiting at the pre-determined location ("Hey Juan, I'm in a white Escalade, old man, a Cadillac Escalade old man, white one). LOPEZ then told CS2 that his subordinates or drug couriers were on their way to complete the cocaine deal with CS2 ("they are passing Food City, they'll be there now").   Based on my training and experience as well as other aspects of the investigation, I believe the LOPEZ then shifted the conversation to discuss a possible upcoming party with CS2.  CS2 expressed reluctance to have the party at his house ("I don't know if I should do it at my house bro…it forms a mess") and stated that its better to simply have a party at a large cabin ("it's better I rent a fuckin cabin, and there are several ones with 17 rooms, about 10 rooms, some with 5 floors") and that he didn't want a large gathering ("I also don't want all the county bro, only the cool people").

14.    A short time after CS2's call with LOPEZ, MARTINEZ and two unknown males arrived in a vehicle at the location where LOPEZ and CS2 had agreed to do the cocaine deal. Law enforcement was positioned nearby to observe the deal occur. MARTINEZ spoke with CS2 and gave CS2 his cell-phone number, the MARTINEZ PHONE number. LOPEZ did not show up to the deal with CS2. CS2 received approximately 8 grams of cocaine in this deal and paid $500 for the 8 grams. After the deal was completed, law enforcement followed MARTINEZ and the two unknown males after they left the cocaine deal location. MARTINEZ and the unknown males drove to a nearby parking lot where they met with LOPEZ, who was sitting in his car. Law enforcement observed one of the individuals that had delivered the drugs to CS2 hand something to LOPEZ. Law enforcement believes, based on their training and experience as well as the context within this investigation, that LOPEZ was handed the cash proceeds of the drug sale to CS2 that

had just occurred. LOPEZ was then followed by law enforcement back to a mobile home located at 3023 Bryan Road, Lot 26, Kodak, Tennessee, hereinafter the "LOPEZ STASH HOUSE." LOPEZ has been spotted by law enforcement surveillance at the LOPEZ STASH HOUSE[4] on several occasions since July of 2020.

15. According to toll records, on July 9, 2020, the same day as the above-mentioned controlled drug buy, MARTINEZ using MARTINEZ PHONE, and LOPEZ using the LOPEZ TELEPHONE, were in frequent communication. Toll records demonstrated approximately 23 instances of communication between MARTINEZ and LOPEZ on July 9, 2020.

16. On July 22, 2020, CS1 purchased approximately 4 grams of cocaine from MARTINEZ in an audio/video recorded controlled buy on behalf of law enforcement within the Eastern District of Tennessee. CS1 called MARTINEZ on the MARTINEZ PHONE to setup this deal, this call was recorded and done in front of law enforcement.

17. On July 22, 2020, while the deal described above was planned and executed, MARTINEZ, using the MARTINEZ PHONE, and LOPEZ, using the LOPEZ TELEPHONE, were in frequent communication. According to tolls records, they communicated 8 times on July 22, 2020.

18. On or about August 18, 2020, Nolvia Carrillo ("NOLVIA")[5] was stopped by local law enforcement officers in Sevier County, Tennessee. Law enforcement discovered approximately 2

---

[4] As noted later in this affidavit, a photograph with imbedded geo-location metadata indicating that it was taken in the LOPEZ STASH HOUSE, showed what appeared to law enforcement to be a large amount of cocaine. This photograph was on NOLVIA's phone. LOPEZ has been frequently spotted by law enforcement surveillance at this location.

[5] NOLVIA, after her arrest for the possession of cocaine, was working with law enforcement with the likely goal of reducing any charges and/or sentence, as well as potentially avoiding deportation. The information NOLVIA provided on MARIO was considered trustworthy and reliable, in part because her information was fully corroborated through messages and photographs on her phone as well as subsequent law enforcement investigation. However, NOLVIA is not considered a reliable source of information as it relates to LOPEZ. LOPEZ drove NOLVIA to one meeting with law enforcement and travel records indicate LOPEZ and NOLVIA may have traveled to Texas together. As such, NOLVIA may be in a close professional or personal relationship with LOPEZ. Law enforcement believes that NOLVIA is protecting LOPEZ because she has tried to avoid talking about LOPEZ during her conversations with law enforcement and has steered the conversation away from LOPEZ when his name has come up.

grams of cocaine and $1,966 in cash in her purse. NOLVIA, who is not a legal resident of the United States, agreed to speak with law enforcement. NOLVIA told law enforcement that she worked with someone named "Giovanni" (listed in her phone as "Jobani Culmi")(hereinafter "JOBANI") to purchase kilogram quantities of cocaine from someone named MARIO in Texas. Law enforcement later identified Mario Antonio Garcia Collantes as MARIO, hereinafter "MARIO." After purchasing the cocaine in Texas, NOLVIA told law enforcement that they then drove the cocaine back to Tennessee. NOLVIA stated that JOBANI paid $32,000 for the cocaine, while NOLVIA was paid approximately $1,000 for riding with JOBANI to Texas and back. NOLVIA consented to law enforcement searching her phone. One of the text message conversations in NOLVIA's phone was with MARIO, who was using 214-972-8501 ("MARIO PHONE 1"). On or about August 14, 2020, NOLVIA and MARIO, using MARIO PHONE 1, had the following text message exchange[6]:

> NOLVIA told MARIO "they want 2"
>
> MARIO responded to NOLVIA "let me ask"
>
> NOLVIA texted MARIO to ask "if they can get 3 can they get a better price"
>
> MARIO responded with a thumbs up

19.     Based on my training and experience, as well as the context within this case, I believe that during the above conversations, MARIO and NOLVIA were arranging a kilogram quantity sale of cocaine. NOLVIA told MARIO she wanted to buy "2" kilograms or half kilograms of cocaine and asked if they could get a better price if they bought three ("if they can get 3 can they get a better price"). MARIO confirmed that if they bought more cocaine, they would get a better price by responding with a thumbs up.

---

[6] This conversation was originally in Spanish and was translated by a fluent speaker of English and Spanish.

20. Law enforcement found a photograph on NOLVIA's phone that showed a large amount of a white powdery substance that she told law enforcement was cocaine. This photograph, according to geo-location meta-data attached to the photograph, was taken at the LOPEZ STASH HOUSE on or about August 15, 2020. The photo was taken approximately 1 day after NOLVIA's conversations with MARIO about purchasing several kilograms of cocaine as noted above on or about August 14, 2020.

21. Law enforcement investigation, including through tolls records, toll analysis, recorded calls, and subscriber data, learned that MARIO appeared to use at least 4 different phones since August of 2020. Tolls records also indicate that before MARIO dropped MARIO PHONE 1 and began using different phone numbers, he had multiple conversations with LOPEZ. For example, toll records show that MARIO, using MARIO PHONE 1, and LOPEZ, using the LOPEZ PHONE, communicated 11 times since approximately June of 2020, including most recently a call on or about August 14, 2020.

22. In my training and experience, I am aware that Texas is a source area for illegal drugs, including cocaine, that flow into the Eastern District of Tennessee for distribution to users. I am also aware that drug traffickers frequently discuss prices and weights without actually naming the specific drug that is being negotiated for sale. Indeed, it would be rather unusual for a drug trafficker to explicitly state that the item being purchased was cocaine or another drug. Finally, I'm aware that when drug traffickers sell drugs, they will often offer a lower price per kilogram or gram when larger quantities are purchased at once, which allows the seller to earn a larger profit for the same risk of law enforcement discovery or worse. In light of all of the evidence in this case, coupled with my training and experience, I believe that LOPEZ is involved in the ongoing distribution of kilogram quantities of cocaine in the Eastern District of Tennessee.

23.     There is also evidence that this DTO is driving bulk cash proceeds from drug sales back towards Texas and the border. MARIO was tied to two seizures totally $185,000 found hidden in vehicles traveling to and in Texas. For example, MARIO was involved in a traffic stop in the Western District of Louisiana on or about June 15, 2020. MARIO and Marcos Ramirez ("RAMIREZ") were the occupants in a vehicle traveling westbound on an interstate highway towards the state of Texas, in western Louisiana. They told law enforcement that they were returning from Pigeon Forge, Tennessee, in Sevier County, which the same County where LOPEZ, MARTINEZ, and NOLVIA live and operate. During that traffic stop, law enforcement discovered approximately $84,000 in cash and approximately 249 grams of what law enforcement believes is marijuana. The cash was hidden in a box and in the side panels of the vehicle. The marijuana was hidden in a cutout spare tire. MARIO and RAMIREZ denied knowing about the money or marijuana in the car. After this traffic stop, both MARIO and RAMIREZ were cited by local authorities with misdemeanor possession of marijuana. The report from this arrest lists money laundering charges for MARIO and RAMIREZ as "pending" with the local district attorney's office. Both were released from custody. No charges are listed pending in NCIC, so MARIO and RAMIREZ may not face felony criminal charges from this stop.

24.     On or about August 26, 2020, near Huntsville, Texas, local law enforcement conducted a traffic stop on a vehicle with two passengers. RAMIREZ again, was one occupant, and the other occupant was TULIO. TULIO was listed in the police report as from Sevierville, Tennessee. Hidden inside the vehicle, law enforcement discovered approximately $101,000 in cash. Both TULIO and RAMIREZ denied knowing about the hidden money in the vehicle. Both occupants were charged with Money Laundering by local authorities in Texas and those charges are pending. Both were later detained by federal officials for deportation because they were not lawfully in the

United States. TULIO was later deported. RAMIREZ has been released from custody pending deportation because of health concerns.

25.     While they were detained awaiting deportation after their traffic stop on August 26, 2020, both TULIO and RAMIREZ spoke with MARIO over recorded prison telephone lines. MARIO, as noted elsewhere, was in communication with NOLVIA about the sale of kilogram quantities of cocaine right before NOLVIA took a picture in the LOPEZ STASH HOUSE of a large amount of white powdery substance that she told law enforcement was cocaine. As noted earlier, LOPEZ himself was in contact with MARIO PHONE 1, a phone used by MARIO, before MARIO switched to new telephone numbers. And as noted elsewhere, LOPEZ himself dropped NOLVIA off at the police station so that she could speak with law enforcement.

**Intercepts**

26.     Law enforcement obtained a wiretap authorization to listen to wire communications over the LOPEZ TELEPHONE, signed by United States District Court Judge Thomas A. Varlan, and interception began on Monday, November 23, 2020.

27.     During the interception of the LOPEZ TELEPHONE, on or about November 29, 2020, law enforcement heard LOPEZ telling a person that he "going to make his rounds to people that owed him," or words to that effect. Earlier, on November 26, 2020, LOPEZ, using the LOPEZ TELEPHONE was intercepted speaking with the user of the TOSCANO PHONE. During that call LOPEZ stated that he would be "coming down on Monday," likely referring to Monday, November 30, 2020.  He also stated, "I'll bring the money and pick it up on Monday, God willing."[7]

---

[7] These calls were in Spanish and translated into English by a fluent speaker of both languages.

28.     From the calls described above, and based on my training and experience, as well as the context within this investigation, I believe that LOPEZ was referencing efforts to gather money to buy more cocaine or another drug from the user of the TOSCANO PHONE ("going to make his rounds to people that owed him") and then discussed the purchase of cocaine or another drug with his supplier, the user of the TOSCANO PHONE, on Monday ("I'll bring the money and pick it up on Monday God willing.")  I also believe that the phrase "coming down" refers to travel out of the state to purchase narcotics from his supplier, the user of the TOSCANO PHONE. LOPEZ has been intercepted having numerous conversations about buying or leasing cars and registering those cars in Tennessee. He talks openly about these dealings, discussing vehicles, makes, models, mileage, and prices. Then suddenly, when he spoke with the TOSCANO PHONE, his language got extremely vague and neither party to the intercepted call would define what they were arranging to buy/sell and pickup. This only buttresses my opinion that the LOPEZ call with the TOSCANO PHONE was about the purchase of narcotics. Based on my training and experience, drug traffickers are loath to openly discuss the name of the drug they are purchasing or get into detail about their dealings over the phone in case those calls are being intercepted or overheard by law enforcement or others.  In particular, when dealing with those they have had prior dealings with, drug traffickers will often simply arrange to do the same deal again, having already agreed to a price and an amount, thus limiting their need to discuss the details of their pending drug transaction. Since October 18, 2020 there have been approximately 31 contacts between the LOPEZ PHONE and the TOSCANO PHONE.

29.     During surveillance on or about November 28 and 29, 2020, law enforcement observed LOPEZ driving or being driven to visit numerous locations, possibly in an effort to collect money,

but law enforcement was not able to observe what LOPEZ was doing after he left the vehicle law enforcement was surveilling.

30. On Monday, November 30, 2020, the day of the appointed deal, at approximately noon, LOPEZ, using the LOPEZ PHONE spoke with the user of the TOSCANO PHONE as follows:

TOSCANO PHONE: I am just calling you to check if you are coming over so I can wait for you.

LOPEZ:  Around 10.

TOSCANO PHONE: What time did you say?

LOPEZ:  Around 10.

TOSCANO PHONE: Alright then. So I can have it ready.

TOSCANO PHONE: We'll wait for you and have it ready. Okay.

LOPEZ:  Thank you.

31. Based on my training and experience, as well as the context within this investigation, I believe that during this call, the user of the TOSCANO PHONE told LOPEZ asked what time the drug deal was going to happen, ("What time did you say?") to which LOPEZ replied 10pm ("Around 10.") The user of the TOSCANO PHONE told LOPEZ that he was ready to do the drug deal and that he would have the product ready ("We'll wait for you and have it ready") and LOPEZ replied "thank you." Like the previous conversation, this conversation stands out from LOPEZ's conversations about buying and selling cars in that both participants are inexplicably vague about what exactly they are going to exchange. This only buttresses my opinion that this call is about a drug deal.

32. On Monday, November 30, 2020, and based intercepted wire conversations and geo-location data obtained by federal law enforcement through federal search warrants, law enforcement knows that LOPEZ flew to Miami in the evening. It is not known if he met with the

user of the TOSCANO PHONE that night after "going down" to Miami. The following day, on December 1, 2020, the user of the TOSCANO PHONE called the LOPEZ PHONE numerous times but LOPEZ did not answer. On December 2, 2020, another phone number, on the same cell-service provider account as the TOSCANO PHONE, attempted to call the LOPEZ PHONE, but LOPEZ did not answer. This morning, on December 3, 2020, LOPEZ, using the LOPEZ PHONE and another phone number on the same cell-service provider account as the TOSCANO PHONE, had a conversation that lasted approximately 40 seconds. This call was not monitored because it was outside the window of time that law enforcement is currently monitoring calls on the LOPEZ PHONE.

33. Law enforcement learned that the user of the TOSCANO PHONE has recently been in contact with the target of a federal drug investigation in Georgia. Law enforcement in Georgia relayed to law enforcement in Knoxville that they have evidence that kilograms of cocaine are being driven from the Forest Park, Georgia area into the Savannah area of Georgia. Based on a search of NCIC records and other public databases, Adan Toscano has a Georgia driver's license that lists an address in Forest Park, Georgia.

34. Forest Park, Georgia is a town near and outside of Atlanta, Georgia. The Atlanta, Georgia area is an area that I'm aware has been a source of supply region for narcotics flowing from Mexico, into the Atlanta area, and then into the Eastern District of Tennessee and elsewhere. Specifically, I'm aware that many recent drug investigations in the Eastern District of Tennessee involved suppliers of kilogram quantities of narcotics in the Atlanta, Georgia region supplying kilogram quantities of narcotics to individuals traveling from the Eastern District of Tennessee.

35. Law enforcement believes that the user of the TOSCANO PHONE is likely Rafael Garcia. According to a law enforcement database that covers financial transactions, someone named Adan

Toscano sent $1605 to a Rafael Garcia with a listed address of 4722 Derry Street, Forest Park, Georgia, and a listed telephone number of the TOSCANO PHONE, on or about September 28, 2019. Adan Toscano is the subscriber name for the TOSCANO PHONE and yet that name sent money to a Rafael Garcia who listed the TOSCANO PHONE as his phone number. Law enforcement believes that Adan Toscano opened the Verizon account for the TOSCANO PHONE but that Rafael Garcia ("GARCIA") is the likely user of the phone.

36.      On or about Wednesday, December 9, 2020, at approximately 630pm, LOPEZ, using the LOPEZ PHONE called NOLVIA. LOPEZ told NOLVIA that he sent "Don Rafa's number from Sevierville" to NOLVIA. LOPEZ also told NOLVIA to tell "Don Rafa" that he was in hospital with the Corona virus (this was not true), and to get "Don Rafa" to send pictures and his address to NOLVIA. Finally, LOPEZ tells NOLVIA to tell "Don Rafa" that "they are going over to Don Rafa during the weekend."

37.      During this conversation, I believe based on my training and experience as well as the context of this investigation, I believe that LOPEZ was trying to put off speaking with "Don Rafa" until the weekend. But he told NOLVIA to get pictures of what I believe to be cocaine or another product as well as addresses from "Don Rafa" so that they could purchase drugs with "Don Rafa" over the weekend. It is not clear from this conversation whether, as noted below, that LOPEZ knew that "Don Rafa" was already in Sevier County that day.

38.      Shortly after this conversation with LOPEZ on December 9, 2020, and based on a pen register on the TOSCANO PHONE, law enforcement learned that NOLVIA and the TOSCANO PHONE began a flurry of communications, including several calls and text messages between NOLVIA and the user of the TOSCANO PHONE.

39. That same Wednesday, December 9, 2020, geo-location information from the TOSCANO PHONE indicated that the TOSCANO PHONE traveled into Sevier County. Based on geo-location data on the TOSCANO PHONE, law enforcement knows that the TOSCANO PHONE is normally located in the Northern District of Georgia. The "pings," or locations of the phone given by the provider on the TOSCANO PHONE were insufficiently precise to allow law enforcement to locate the user of the TOSCANO PHONE that day. But the geo-location information indicated that the phone traveled first into Sevier County, then up to the Halls area of Knoxville, and then back into the Sevier County area, all on December 9, 2020. Despite an extended attempt to locate and surveil the user of the TOSCANO PHONE on December 9, 2020. We do not know if the user of the TOSCANO PHONE met with any members of the LOPEZ DTO that day. But as noted below, LOPEZ began selling drugs that same day and did not communicate with the TOSCANO PHONE over the subsequent weekend. As such, we suspect that the user of the TOSCANO PHONE was able to meet with members of the LOPEZ DTO and supply that organization with cocaine or another drug to sell.

40. I know, based on my training and experience, that the use of the term "Don" to address a person in Spanish is normally a sign of respect. I also know that suppliers of large amounts of drugs are commonly referred to as "Don" in narcotics investigations, particularly when that person is connected to a powerful group of drug traffickers and/or is a respected older gentlemen. "Rafa" is a nickname often given to those with the name Rafael. As such, and coupled with all the information available in this investigation, law enforcement believes that "Don Rafa" is Rafael Garcia, the user of the TOSCANO PHONE. LOPEZ's use of the term "Don" to refer to GARCIA fits and buttresses the prior assessment by law enforcement that the user of the TOSCANO PHONE was supplying narcotics to LOPEZ.

41.     Despite the reluctance of LOPEZ to personally meet with "Don Rafa" on December 9, 2020, that same day as the TOSCANO PHONE traveled to Sevier County, LOPEZ asked MARTINEZ to bring "three baggies, over here at La Carreta, from the ones I gave you." This conversation was intercepted over the LOPEZ PHONE.

42.     Based on my training and experience, as well as the context within this investigation, I believe that during this conversation, LOPEZ asked MARTINEZ to bring three baggies of cocaine to sell over to the restaurant La Carreta in Sevier County. Because this was the first time over the wiretap that began on or about November 23, 2020, that LOPEZ had a discussion with MARTINEZ about the sale of drugs locally in Sevier County, I believe that it is likely that the drug trafficking organization run by LOPEZ was likely resupplied with drugs that same day. This coincides with the trip by the TOSCANO PHONE into Sevier County after, as noted above, LOPEZ and the user of the TOSCANO PHONE negotiated a sale on previous occasions over intercepted calls on the LOPEZ PHONE.

43.     On or about December 12, 2020, law enforcement intercepted a call to a male using telephone number (865) 214-4500, believed to be used by a male named "JAMES," from LOPEZ over the LOPEZ PHONE. During the call at approximately 2pm, LOPEZ tells JAMES that he has two "bucks, the nice ones," and offers to sell JAMES the "green ones, the trees." JAMES responds that he needs to "round up some bucks." That same day, at around 8pm, JAMES calls LOPEZ back and asks LOPEZ for "a quarter." LOPEZ responds that "it is going to be good." The two then discussed the timing and location of a possible deal.

44.     Based on my training and experience, I believe that during these calls, LOPEZ offers to sell JAMES narcotics, likely cocaine ("bucks, the nice ones") and marijuana (the green ones, the trees.") JAMES tells LOPEZ he needs to round up some money ("round up some bucks.") JAMES

then calls LOPEZ back and asks LOPEZ for a quarter ounce of cocaine ("a quarter.") LOPEZ responds that "it is going to be good," meaning that the quality of the cocaine is good.

45.     A few minutes after he got off the phone with JAMES, LOPEZ, using the LOPEZ PHONE, calls MARTINEZ, using the MARTINEZ PHONE. LOPEZ told MARTINEZ that "Chivo," likely referring to JAMES, "wants two eights." MARTINEZ responds "Okay." They then coordinated a meeting place for MARTINEZ to deliver "two eights" to CHIVO. Based on my training and experience I know that "two eights" likely refers to two eight-balls, or a quarter ounce of a narcotic.

46.     Later that same night, on December 12, 2020, law enforcement surveilled MARTINEZ meeting with a white male named JAMES. After they met, law enforcement pulled over JAMES. After a drug detection dog hit on JAMES's vehicle, law enforcement discovered approximately two pounds of what appeared to be marijuana and approximately 4 grams of what appeared to be cocaine from JAMES and his vehicle. JAMES admitted to law enforcement that he had been buying cocaine and other drugs from LOPEZ for approximately 2 years and had arranged to purchase cocaine from LOPEZ that night.

47.     Based on tolls records, law enforcement is also aware that the TOSCANO PHONE communicates with Mexican telephone numbers, which is a well-known source of supply country for cocaine and other narcotics flowing into the United States generally and the Atlanta, Georgia region specifically.

48.     Law enforcement is also aware that the user of the TOSCANO PHONE uses text messaging to communicate. Between October 18, 2020 and November 28, 2020, the TOSCANO PHONE sent or received approximately 109 text messages, including over 30 text messages with Mexican telephone numbers. Moreover, as noted above, law enforcement knows that the TOSCANO PHONE communicated via text message with NOLVIA in the past 7 days.

49.     Based on my training and experience, I know that drug traffickers frequently use text messaging, along with telephone calls to run their drug trafficking business.   In summary, I believe that based on the information above, there is probable cause to believe that the user of the TOSCANO PHONE is a drug supplier for the LOPEZ drug trafficking organization and/or others, and that the TOSCANO PHONE is using text message to communicate regarding drug trafficking.[8]

## Technical Information

50.     In my training and experience, I have learned that VERIZON is a company that provides cellular telephone access to the general-public, and that stored electronic communications, including retrieved and unretrieved text, and multimedia messages for VERIZON subscribers may be located on the computers of VERIZON. Further, I am aware that computers located at VERIZON contain information and other stored electronic communications belonging to unrelated third parties.

51.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by VERIZON for

---

[8] A previous federal search warrant served on Verizon for the TOSCANO PHONE did not yield text message content despite their being text messages within the sought covered period. I believe that VERIZON possibly did not process a preservation letter to preserve these text messages and thus the requested content was deleted on the VERIZON servers before the information could be sent to law enforcement.  In this case, a new preservation letter was sent to VERIZON on or about December 12, 2020 and this time VERIZON confirmed its receipt and that any text messages were being preserved on their servers.

short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

52.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

53.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

54. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

55. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

56. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

57. As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each

element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

58.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require VERIZON to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment B.

## **CONCLUSION**

59.     Based on the foregoing, I request that the Court issue the proposed search warrant.

Respectfully Submitted,

FBI TFO STEFFAN HOLLIFIELD

Subscribed and Sworn to before on December 14, 2020,

H. BRUCE GUYTON
United States Magistrate Judge

23

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with telephone number (971) 732-3277 (hereinafter "TOSCANO PHONE") that are stored at premises owned, maintained, controlled, or operated by VERIZON, a wireless provider, or any telephone number subsequently assigned to the instrument bearing the same electronic serial number or similar identifier as the TOSCANO PHONE.

## ATTACHMENT B

### Particular Things to be Seized, And Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of **VERIZON**, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to **VERIZON** or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **VERIZON** is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.    All, text, and multimedia messages stored and presently contained in, or on behalf of the accounts or identifiers from December 3, 2020 until December 14, 2020 ("the covered period");

    b.    All transactional information of all activity of the telephone accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used, for the covered period;

    c.    All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

d.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), for covered period;

The provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.